PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 06-3090, 06-3091,
06-3092, 06-3093, 06-3094, 06-3095

———————

MR. DARRELL COMBS; MRS. KATHLEEN COMBS
Appellants at No. 06-3090

v.

HOMER-CENTER SCHOOL DISTRICT;
JOSEPH F. MARCOLINE, in his official capacity as
Superintendent of Homer-Center School District;
TITUSVILLE AREA SCHOOL DISTRICT;
BRISTOL TOWNSHIP SCHOOL DISTRICT;
FRANKLIN REGIONAL SCHOOL DISTRICT
(D.C. Civil Action No. 04-cv-1599)

DR. THOMAS PREVISH; TIMARI PREVISH
Appellants at No. 06-3091

v.

NORWIN SCHOOL DISTRICT;

RICHARD WATSON, in his official capacity as
Superintendent of Norwin School District
(D.C. Civil Action No. 04-cv-1670)

DR. MARK NEWBORN; MRS. MARYALICE NEWBORN
Appellants at No. 06-3092

v.

FRANKLIN REGIONAL SCHOOL DISTRICT;
STEPHEN VAK, in his official capacity as
Superintendent of Franklin Regional School District
(D.C. Civil Action 04-cv-1932)

MR. THOMAS HANKIN; MRS. BABETTE HANKIN
Appellants at No. 06-3093

v.

BRISTOL TOWNSHIP SCHOOL DISTRICT;
REGINA CESARIO, in her official capacity as
Superintendent of Bristol Township School District
(D.C. Civil Action 04-cv-1936)

MR. DOUGLAS NELSON; MRS. SHARI NELSON
Appellants at No. 06-3094

v.

2

TITUSVILLE AREA SCHOOL DISTRICT;
JOHN D. REAGLE, in his official capacity as
Acting Superintendent of Titusville Area School District
(D.C. Civil Action 05-cv-0070)

REV. STEVEN WEBER; MRS. MEG WEBER
Appellants at No. 06-3095

v.

DuBOIS AREA SCHOOL DISTRICT;
SHARON KIRK, in her official capacity as
Superintendent of DuBois Area School District
(D.C. Civil Action 05-cv-0203)

―――――――――――

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Honorable Arthur J. Schwab)

―――――――――

Argued November 6, 2007

Before:  SCIRICA, *Chief Judge*,
AMBRO and JORDAN, *Circuit Judges*.

(Filed: August 21, 2008 )

3

MICHAEL P. FARRIS, ESQUIRE (ARGUED)
JAMES R. MASON, III, ESQUIRE
Home School Legal Defense Association
1 Patrick Henry Circle
Purcellville, Virginia 20132-0000
        Attorneys for Appellants

CARL P. BEARD, JR., ESQUIRE
PATRICK J. FANELLI, ESQUIRE
Andrews & Beard
3366 Lynnwood Drive
P.O. Box 1311
Altoona, Pennsylvania 16603
        Attorneys for Appellee,
        Homer-Center School District

CHRISTINA LANE, ESQUIRE
Andrews & Price
1500 Ardmore Boulevard, Suite 506
Pittsburgh, Pennsylvania 15221
        Attorney for Appellees,
        Homer-Center School District,
        Titusville Area School District,
        Bristol Township School District,
        Franklin Regional School District,
        Stephen Vak, in his official capacity as
        Superintendent of Franklin Regional School District,
        Norwin School District, DuBois Area School District

4

PATRICIA K. SMITH, ESQUIRE
Knox McLaughlin Gornall & Sennett
120 West Tenth Street
Erie, Pennsylvania 16501
       Attorney for Appellees,
       Titusville Area School District,
       John D. Reagle, in his official capacity as
       Acting Superintendent of Titusville Area School District

PAUL N. LALLEY, ESQUIRE (ARGUED)
Levin Legal Group, P.C.
1301 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, Pennsylvania 19006
       Attorney for Appellees,
       Bristol Township School District,
       Regina Cesario, in her official capacity as
       Superintendent of Bristol Township School District

MICHAEL L. BRUNGO, ESQUIRE
RONALD R. LUCAS, JR., ESQUIRE
ALFRED C. MAIELLO, ESQUIRE
Maiello Brungo & Maiello, LLP
3301 McCrady Road
One Churchill Park
Pittsburgh, Pennsylvania 15235
       Attorneys for Appellees,
       Norwin School District,

Richard Watson, in his official capacity as
Superintendent of Norwin School District,
DuBois Area School District,
Sharon Kirk, in her official capacity as
Superintendent of DuBois Area School District

CHRISTOPHER C. LUND, ESQUIRE
Dechert LLP
Cira Centre, 18th Floor
2929 Arch Street
Philadelphia, Pennsylvania 19104
        Attorney for Amicus Curiae-Appellant,
        American Civil Liberties Union of Pennsylvania

ANN G. ST. LEDGER, ESQUIRE
Office of Attorney General of Pennsylvania
Department of Education
333 Market Street, Suite 911
Harrisburg, Pennsylvania 17126
        Attorney for Amicus Curiae-Appellee,
        Pennsylvania Department of Education

SEAN A. FIELDS, ESQUIRE
Pennsylvania School Boards Association
400 Bent Creek Boulevard, P.O. Box 2042
Mechanicsburg, Pennsylvania 17055
        Attorney for Amicus Curiae-Appellee,
        Pennsylvania School Boards Association

6

JEFFREY I. PASEK, ESQUIRE
Cozen & O'Connor
1900 Market Street, 3rd Floor
Philadelphia, Pennsylvania 19103
      Attorney for Amicus Curiae-Appellee,
      Jewish Social Policy Action Network

————————————

## OPINION OF THE COURT

————————————

PER CURIAM.

    At issue is whether certain parents who home-school their children must comply with the reporting and review requirements of Pennsylvania's compulsory education law. Compliance, the parents contend, would violate their sincerely held religious beliefs. The Commonwealth of Pennsylvania demurs, contending its compulsory education law neither substantially burdens the free exercise of religion nor transgresses neutral application to all citizens, and serves an important state interest in ensuring a minimal level of education for all children.

    Plaintiffs appeal from the grant of summary judgment for defendants in an action seeking declaratory relief and an injunction prohibiting enforcement of 24 Pa. Stat. Ann. § 13-1327.1 ("Act 169") and prosecution under Pennsylvania's

compulsory education laws. Defendants are school districts in Pennsylvania and superintendents named in their official capacity.[1] Plaintiffs are six families who home-school their children.[2]

The Commonwealth of Pennsylvania's education system, as enacted by the General Assembly, allows parents to satisfy the compulsory attendance requirement through "home education programs." Parents supervising the home education programs must provide instruction for a minimum number of days and hours in certain subjects and submit a portfolio of teaching logs and the children's work product for review. The local school district reviews the home education programs for compliance with the minimum hours of instruction and course requirements and determines whether each student demonstrates progress in the overall program. The school district does not

---

[1]We refer to Homer-Center School District, Joseph F. Marcoline, Norwin School District, Richard Watson, Franklin Regional School District, Stephen Vak, Bristol Township School District, Regina Cesario, Titusville Area School District, John D. Reagle, DuBois Area School District and Sharon Kirk collectively as the "school districts."

[2]The "Parents" are Darrell and Kathleen Combs, Thomas and Timari Prevish, Mark and Maryalice Newborn, Thomas and Babette Hankin, Douglas and Shari Nelson, and Steven and Meg Weber.

review the educational content, textbooks, curriculum, instructional materials, or methodology of the program.

Parents, who home-school their children based on their sincerely held religious beliefs, have sued their respective school districts and school superintendents. Parents contend the Act 169 record-keeping requirements and the subsequent portfolio review place a substantial burden on their free exercise of religion. They seek an exemption from the Act 169 requirements and request declaratory and injunctive relief on the grounds that the provisions of Act 169 violate the First and Fourteenth Amendments of the Constitution of the United States and the Pennsylvania Religious Freedom Protection Act ("RFPA"), 71 Pa. Stat. Ann. §§ 2401–2407.

I.

Parents have home-schooled their children for many years. All six families are Christians, but of different denominations. They hold in common a religious belief that "education of their children, not merely the religious education, is religion" and that God has assigned religious matters to the exclusive jurisdiction of the family. Accordingly, because God has given Parents the sole responsibility for educating their children, the school districts' reporting requirements and "discretionary review" over their home education programs violate their free exercise of religion.

In 2002, the Commonwealth of Pennsylvania passed the Religious Freedom Protection Act. The statute requires the

9

Commonwealth to justify substantial burdens on religious free exercise with a compelling interest and a showing that the least restrictive means has been employed to satisfy that interest. Prior to the passage of the Religious Freedom Protection Act, many of the Parents complied with the Act 169 home education program requirements.[3] Pre-RFPA, there is no evidence that the school districts ever questioned or interfered with Parents' home education programs' educational content, methodology, curriculum, or materials. On some occasions, the school districts required Parents to supplement their logs and portfolios with additional information. But Parents are unable to identify an instance in which the school districts rejected any part of their home education program.

Nevertheless, post-RFPA, Parents notified the school districts that Act 169 substantially burdens their free exercise of religion and sought an exemption from compliance.[4] The school

----

[3]Thomas and Babette Hankin have never complied with Act 169.

[4]*See* 71 Pa. Stat. Ann. § 2405(b) (requiring, prior to bringing an action in court, the party to provide the agency with written notice); § 2405(d) (the agency "may remedy the substantial burden on the person's free exercise of religion" within 30 days of the written notice). Darrell and Kathleen Combs refused to submit the required affidavits and portfolios, thereby ceasing to comply with Act 169.

districts refused to grant Parents an exemption from Act 169 and threatened or, in some cases, initiated criminal prosecutions for truancy.

In response, Parents sued the school districts in various state and federal courts seeking declaratory and injunctive relief under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and RFPA. Ultimately, the cases ended up before the United States District Court for the Western District of Pennsylvania, which consolidated the six cases for pre-trial and summary judgment purposes. Upon consent of the parties, discovery was limited to "threshold legal issues" such as whether Act 169 substantially burdened Parents' free exercise of religion under the RFPA and the proper standard of review for Parents' federal constitutional claims. The District Court engaged in two rounds of summary judgment motions.

The first round addressed facial challenges to Act 169. Parents filed a consolidated motion for summary judgment and the school districts filed a consolidated opposition, but did not file a cross-motion for summary judgment. The District Court denied Parents' motion. *Combs v. Homer Ctr. Sch. Dist.*, 2005 WL 3338885 (W.D. Pa. Dec. 8, 2005). In the second round, the school districts filed a motion for summary judgment addressing both Parents' facial and "as applied" challenges to Act 169. The District Court granted the school districts' motion, concluding that (1) Parents failed to prove a "substantial burden" on the free exercise of religion, as defined by RFPA, *Combs v. Homer Ctr. Sch. Dist.*, 468 F. Supp. 2d 738, 771 (W.D. Pa. 2006), and (2)

11

Act 169 is a neutral law of general applicability, satisfying rational basis review,[5] *id.* at 777. As a result, the District Court did not decide issues of compelling governmental interest or least restrictive means.[6]

---

[5]The District Court also rejected Parents' claims based upon the Establishment Clause of the First Amendment, the Due Process Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment. *Id.* at 778. The Statement of Issues in Parents' brief only addresses claims under RFPA and the Free Exercise Clause.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1367 and 1441. We have jurisdiction over the appeal under 28 U.S.C. § 1291. "We review a district court's grant of summary judgment *de novo*." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 260 (3d Cir. 2007) (citing *Gottshall v. Consol. Rail Corp.*, 56 F.3d 530, 533 (3d Cir. 1995)). Summary judgment is only appropriate if there are no genuine issues of material fact and the school districts are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the nonmoving party[:]" Parents. *Lighthouse Inst.*, 510 F.3d at 260.

[6]In a *dictum*, the District Court stated: "Even if this Court were to apply a 'hybrid rights' heightened or strict scrutiny test, however, Plaintiff's free exercise challenge to Act 169 on its face would still fail." *Id.* at 777.

12

II.

A.

The Pennsylvania Constitution mandates that the General Assembly "provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const., Art. III, § 14. The General Assembly has carried out its constitutional charge by enacting the Public School Code. *See* 24 Pa. Stat. Ann. §§ 1-101 to 27-2702.[7]

---

[7]As noted by the District Court, "[a]n educated citizenry has been recognized as critical to the success and well-being of the Nation and its people from the time of its creation." *Combs*, 468 F. Supp. 2d at 740-41. Pennsylvania's commitment to public education is firmly rooted in its history. *See id.* at 741-43. In 1682, the "Great Law" passed by the First General Assembly of Pennsylvania "included a provision for the creation of schools across Pennsylvania." *Id.* at 742. Furthermore, the various Pennsylvania constitutions have included provisions for public education. *Id.* (citing the 1776 provisional Pennsylvania Constitution, the Pennsylvania Constitution of 1874, and Art. II, § 14 of the Pennsylvania Constitution in its current form). The current Pennsylvania Code describes the purpose of public education as "prepar[ing] students for adult life" and creating "self-directed, life-long learners and responsible, involved citizens." 22 Pa. Code. § 4.11(b) (2008).

The Public School Code requires "every child of compulsory school age having a legal residence in this Commonwealth . . . to attend a day school in which the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language." 24 Pa. Stat. Ann. § 13-1327(a). "Compulsory school age" is defined as "the period of a child's life from the time the child's parents elect to have the child enter school, which shall be not later than at the age of eight (8) years, until the age of seventeen (17) years." *Id.* § 13-1326. *See also* 22 Pa. Code § 11.13 (2008). A student who "holds a certificate or graduation from a regularly accredited senior high school" satisfies the compulsory attendance requirement and is no longer of compulsory school age. 24 Pa. Stat. Ann. § 13-1326.

The Pennsylvania General Assembly currently permits parents to choose among four alternative categories of education to satisfy the compulsory attendance requirement: (1) a public school with certain trade school options, *id.* § 13-1327(a);[8] (2)

---

[8]A child may satisfy the compulsory attendance requirement by attending a public day school. 24 Pa. Stat. Ann. § 13-1327(a). "In lieu of such school attendance" any child fifteen years of age who receives approval of the district superintendent and the Secretary of Education, or any child sixteen years of age who receives approval of the district superintendent, may enroll in a trade or business school. *Id.* Attendance at either public day school or a trade or business school satisfies the mandate

14

a private academic day school or private tutoring, *id.*;[9] (3) a day school operated by a "bona fide church or other religious body," *id.* § 13-1327(b);[10] or (4) a "home education program," *id.* § 13-

---

that "every parent, guardian, or other person having control or charge of any child or children of compulsory school age is required to send such child or children to a day school in which the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language." *Id.*

[9]A child may satisfy the compulsory attendance requirement by attending "an accredited or licensed private school," 22 Pa. Code § 11.32 (2008), "in which the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language." 24 Pa. Stat. Ann. § 13-1327(a). "The certificate of any principal or teacher of a private school, or of any institution . . ." must "set[] forth that the work of said school is in compliance with the provisions of this act." *Id.* Also, regular daily instruction in the English language by a properly qualified private tutor satisfies the compulsory attendance requirement. *Id.* The Pennsylvania Administrative Code enumerates minimum hours of instruction and the required subjects at both the elementary and secondary school levels. 22 Pa. Code § 11.31 (2008).

[10]A child may enroll in a day school "operated by a bona fide church or other religious body." 24 Pa. Stat. Ann. § 13-1327(b).

15

———————————

The school must meet minimum standards for hours of instruction and teach the subjects enumerated in the statute. *See id.* ("[A] minimum of one hundred eighty (180) days of instruction or nine hundred (900) hours of instruction per year at the elementary level or nine hundred ninety (990) hours per year of instruction at the secondary level . . . ."); *id.* § 13-1327(b)(1) (requiring at the elementary school level, the following courses: "English, to include spelling, reading and writing; arithmetic; science; geography; history of the United States and Pennsylvania; civics; safety education, including regular and continuous instruction in the dangers and prevention of fires; health and physiology; physical education; music; and art"); *id.* § 13-1327(b)(2) ("At the secondary school level, the following courses [must be] offered: English, to include language, literature, speech and composition; science, to include biology and chemistry; geography; social studies, to include civics, economics, world history, history of the United States and Pennsylvania; a foreign language; mathematics, to include general mathematics and statistics, algebra and geometry; art; music; physical education; health and physiology; and safety education, including regular and continuous instruction in the dangers and prevention of fires.").

Further, the principal must file a notarized affidavit with the Department of Education setting forth that the required subjects are offered in the English language, whether the school is a nonprofit organization, and that the school is otherwise in

16

1327.1.

Significant to this appeal, the Pennsylvania General Assembly permitted the fourth alternative in 1988. *See* Act 169 of 1988, P.L. 1321, No. 169, December 21, 1988, 24 Pa. Stat. Ann. § 13-1327.1. Under Act 169, a child instructed under a "home education program" satisfies the compulsory attendance requirement. *Id.* A home education program must satisfy the same minimum hours of instruction requirements and almost all of the same subject matter requirements as a school operated by a bona fide church or religious body.[11]  *Id.* §§ 13-1327(b), 13-

_____

compliance with the provisions of the Public School Code.  *Id.* § 13-1327(b).

Although the statute requires religious schools to teach certain subjects, "[i]t is the policy of the Commonwealth to preserve the primary right and the obligation of the parent or parents . . . to choose the education and training for such child." *Id.*  Thus, "[n]othing contained in this act shall empower the Commonwealth, any of its officers, agencies or subdivisions to approve the course content, faculty, staff or disciplinary requirements of any religious school referred to in this section without the consent of said school." *Id.*

[11]Act 169 enumerates the following "minimum courses in grades nine through twelve" as a requirement for graduation from a home education program: four years of English; three years of mathematics; three years of science; three years of

1327.1(c).

Prior to the commencement of a home education program, and thereafter on August 1 of each year, the parent or guardian of the child must file an affidavit with the district superintendent setting forth:

> the name of the supervisor of the home education program who shall be responsible for the provision of instruction; the name and age of each child who shall participate . . . ; the address and telephone number of the . . . site; that such subjects as required by law are offered in the English language, including an outline of proposed education objectives by subject area . . . ; and that the home education program shall comply with the provisions of this section . . . .

---

social studies; two years of arts and humanities. 24 Pa. Stat. Ann. § 13-1327.1(d). But, in contrast to § 13-1327(b), Act 169 leaves the decision whether to teach certain secondary level subjects – economics, biology, chemistry, foreign languages, trigonometry, or other age-appropriate courses as contained in 22 Pa. Code Ch. 4 – to the discretion of the supervisor of the home education program. 24 Pa. Stat. Ann. § 13-1327.1(c)(2).

*Id.* § 13-1327.1(b)(1).[12]

The superintendent of the public school district of the child's residence is charged with ensuring that each child is receiving "appropriate education," which is defined by Act 169 as "a program consisting of instruction in the required subjects for the time required in this act and in which the student demonstrates sustained progress in the overall program." *Id.* § 13-1327.1(a). In order to demonstrate to the superintendent that "appropriate education" is taking place, at the end of each public school year the supervisor of the home education program must

---

[12]In addition, the affidavit must provide evidence that the child has been immunized and has received the health and medical services required for students of the child's age or grade level. 24 Pa. Stat. Ann. § 13-1327.1(b)(1). Further, "[t]he affidavit shall contain a certification to be signed by the supervisor that the supervisor, all adults living in the home and persons having legal custody of a child or children in a home education program have not been convicted of the criminal offenses enumerated in subsection (e) of section 111 within five years immediately preceding the date of the affidavit." *Id.* "Supervisor" is defined by Act 169 as "the parent or guardian or such person having legal custody of the child or children who shall be responsible for the provision of instruction, provided that such person has a high school diploma or its equivalent." *Id.* § 13-1327.1(a).

submit a file with two types of documentation.[13]  First, the file
must contain a portfolio of records and materials:

> The portfolio shall consist of a log, made
> contemporaneously with the instruction, which
> designates by title the reading materials used,
> samples of any writings, worksheets, workbooks
> or creative materials used or developed by the
> student and in grades three, five and eight results
> of nationally normed standardized achievement
> tests in reading/language arts and mathematics or
> the results of Statewide tests administered in these
> grade levels.  The department shall establish a list,
> with a minimum of five tests, of nationally
> normed standardized tests from which the
> supervisor of the home education program shall
> select a test to be administered if the supervisor
> does not choose the Statewide tests.  At the
> discretion of the supervisor, the portfolio may
> include the results of nationally normed
> standardized achievement tests for other subject
> areas or grade levels.  The supervisor shall ensure

---

[13]"In addition, if the superintendent has a reasonable belief
that, at any time during the school year, appropriate education
may not be occurring in the home education program, he may .
. . require documentation . . . to be submitted to the district . . .
."  24 Pa. Stat. Ann. § 13-1327.1(h).

> that the nationally normed standardized tests or
> the Statewide tests shall not be administered by
> the child's parent or guardian.

*Id.* § 13-1327.1(e)(1).

Second, the supervisor of the home education program must obtain an annual written evaluation of the child's work. *Id.* § 13-1327.1(e)(2). The supervisor may choose any person qualified under Act 169 to make the evaluation.[14] The

---

[14]Act 169 permits evaluation by "a licensed clinical or school psychologist or a teacher certified by the Commonwealth or by a nonpublic school teacher or administrator." 24 Pa. Stat. Ann. § 13-1327.1(e)(2). "Any such nonpublic teacher or administrator shall have at least two years of teaching experience in a Pennsylvania public or nonpublic school within the last ten years." *Id.* Further, any nonpublic teacher or administrator or certified teacher must have the required "experience at the elementary level to evaluate elementary students or at the secondary level to evaluate secondary students." *Id.*

> A teacher or administrator who evaluates a
> portfolio at the elementary level (grades
> kindergarten through six) shall have at least two
> years of experience in grading any of the
> following subjects: English, to include spelling,
> reading and writing; arithmetic; science;
> geography; history of the United States and

21

evaluation measures:

> the student's educational progress . . . .  The
> evaluation shall also be based on an interview of

---

> Pennsylvania; and civics.

*Id.* § 13-1327.1(e)(1)(i).

> A teacher or administrator who evaluates a
> portfolio at the secondary level (grades seven
> through twelve) shall have at least two years of
> experience in grading any of the following
> subjects: English, to include language, literature,
> speech, reading and composition; science, to
> include biology, chemistry and physics;
> geography; social studies, to include economics,
> civics, world history, history of the United States
> and Pennsylvania; foreign language; and
> mathematics, to include general mathematics,
> algebra, trigonometry, calculus and geometry.

*Id.* § 13-1327.1(e)(1)(ii).  "[T]he term 'grading' shall mean
evaluation of classwork, homework, quizzes, classwork-based
tests and prepared tests related to classwork subject matter." *Id.*
§ 13-1327.1(e)(1)(iii).

> "At the request of the supervisor, persons with other
> qualifications may conduct the evaluation with the prior consent
> of the district of residence superintendent.  In no event shall the
> evaluator be the supervisor or their spouse."  *Id.* § 13-
> 1327.1(e)(2).

the child and a review of the portfolio required in clause (1) and shall certify whether or not an appropriate education is occurring.

*Id.*

Based upon the entire file – the portfolio of records and materials and the third-party evaluation – the superintendent determines whether the home education program provides the child with an "appropriate education."[15]

> If the superintendent . . . determines, based on the documentation provided . . . that appropriate education is not taking place for the child in the home education program, the superintendent shall send a letter . . . to the supervisor of the home education program stating that in his opinion appropriate education is not taking place for the child in the home education program and shall return all documentation, specifying what aspect or aspects of the documentation are inadequate.

*Id.* § 13-1327.1(i). Upon receipt of the letter, the supervisor has twenty days "to submit additional documentation demonstrating that appropriate education is taking place for the child in the

---

[15]The superintendent may not rely upon the outline of proposed educational objectives provided at the beginning of the year when making his "appropriate education" determination. 24 Pa. Stat. Ann. § 13-1327.1(b)(1).

23

home education program." *Id.* § 13-1327.1(j). If the additional documentation is not timely submitted, the home education program "shall be out of compliance" with the compulsory attendance requirements and the student must promptly enroll in either a public school, a nonpublic religious school, or a licensed private school. *Id.*

If the superintendent concludes that a timely amended file still fails to demonstrate appropriate education, he or she will notify the supervisor of his or her determination. Further, the supervisor will be given a "proper hearing by a duly qualified and impartial hearing examiner" within thirty days. *Id.* § 13-1327.1(k).[16]    "If the hearing examiner finds that the documentation does not indicate that appropriate education is taking place in the home education program," the student must be promptly enrolled in either a public school, a nonpublic religious school, or a licensed private academic school.[17] *Id.* §

---

[16]The "hearing examiner" "shall not be an officer, employe [sic] or agent of the Department of Education or of the school district or intermediate unit of residence of the child in the home education program." *Id.* § 13-1327.1(a).

[17]In lieu of rendering a decision, the hearing examiner may "require the establishment of a remedial education plan mutually agreed to by the superintendent and supervisor of the home education program which shall continue the home education program." 24 Pa. Stat. Ann. § 13-1327.1(k).

13-1327.1(l).  "The decision of the [hearing] examiner may be appealed by either the supervisor of the home education program or the superintendent to the Secretary of Education or Commonwealth Court [of Pennsylvania]."  *Id.* § 13-1327.1(k).

In practice, the school districts engage in a limited level of oversight.  The school districts require a minimum of two contacts with the State during the calendar year – the submission of an affidavit at the beginning of the year and the submission of the portfolio and evaluation at the end of the year.  Deposition testimony reveals that school officials do not check in on the progress of home education programs during the school year.  Furthermore, all school officials deposed acknowledged that they never disagreed with or rejected an independent evaluator's assessment of the home education program.  School officials reviewed the disclosures for compliance with the statute and, if all the required disclosures were presented, the home education program would be approved.

B.

As noted, in 2002 the Pennsylvania General Assembly enacted the Religious Freedom Protection Act.  71 Pa. Stat. Ann. §§ 2401–2407.  Titled "[a]n Act protecting the free exercise of religion; and prescribing the conditions under which government may substantially burden a person's free exercise of religion," *Id.* § 2401, the RFPA was based on two legislative findings:

(1) Laws and governmental actions which are

25

facially neutral toward religion, as well as laws and governmental actions intended to interfere with religious exercise, may have the effect of substantially burdening the free exercise of religion. However, neither State nor local government should substantially burden the free exercise of religion without compelling justification.

(2) The General Assembly intends that all laws which it has heretofore enacted or will hereafter enact and all ordinances and regulations which have been or will be adopted by political subdivisions or executive agencies shall be construed so as to avoid the imposition of substantial burdens upon the free exercise of religion without compelling justification.

*Id.* § 2402.

Under RFPA, "an agency shall not substantially burden a person's free exercise of religion, including any burden which results from a rule of general applicability," *id.* § 2404(a), unless "the agency proves, by a preponderance of the evidence, that the burden" is "[i]n furtherance of a compelling interest of the agency" and is "[t]he least restrictive means of furthering the compelling interest," *id.* § 2404(b).

The General Assembly provides definitions for several key terms in section 2404. First, "free exercise of religion"

26

means "[t]he practice or observance of religion under section 3 of Article I of the Constitution of Pennsylvania."[18]  *Id.* § 2403. Second, "person" is defined as "[a]n individual or a church, association of churches or other religious order, body or institution which qualifies for exemption from taxation under section 501(c)(3) or (d) of the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C. § 501)."  71 Pa. Stat. Ann. § 2403.  Third, RFPA defines "substantially burden" as "[a]n agency action which does any of the following:"

> (1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs.
>
> (2) Significantly curtails a person's ability to

---

[18]Article I, Section 3 of the Pennsylvania Constitution provides:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.

Pa. Const., Art. I, § 3.

27

> express adherence to the person's religious faith.
> (3) Denies a person a reasonable opportunity to
> engage in activities which are fundamental to the
> person's religion.
> (4) Compels conduct or expression which violates
> a specific tenet of a person's religious faith.

*Id.*

RFPA allows a "person whose free exercise of religion has been burdened or likely will be burdened in violation of [§ 2404]" to bring a claim in a judicial proceeding. *Id.* § 2405(a). Prior to bringing a claim, the "person" must notify the agency, describing the agency action and the manner in which it burdens religion. *Id.* § 2405(b). A "person" who "proves, by clear and convincing evidence, that the person's free exercise of religion has been burdened . . . in violation of [§ 2404]" may receive declaratory or injunctive relief. *Id.* § 2405(f). Monetary damages are not available. *Id.*

With limited exceptions, 71 Pa. Stat. Ann. § 2406(a)–(b), RFPA applies "to any State or local law or ordinance and the implementation of that law or ordinance, whether statutory or otherwise and whether adopted or effective prior to or after the effective date of this act," *id.* § 2406(a). Thus, RFPA applies to the Public School Code, 24 Pa. Stat. Ann. §§ 1-101 to 27-2702.

III.

We address Parents' federal constitutional claim. Parents

28

contend Act 169 imposes a substantial burden on the free exercise of religion as protected by the First and Fourteenth Amendments.[19]  The Commonwealth asserts Act 169 is a neutral law of general applicability that is rationally related to the legitimate governmental interest in ensuring a minimal level of education for all children.  Applying rational basis review, the District Court concluded that "Act 169 passes constitutional muster as a neutral law of general applicability and effect." *Combs*, 468 F. Supp. 2d at 777.  Accordingly, the District Court denied Parents' motion for summary judgment as to the facial challenge to Act 169 as a violation of the First Amendment of the United States Constitution and granted the school districts' motion for summary judgment as to Parents' as-applied challenges.

## A.

In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 890 (1990), the Supreme Court held "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993); *see also Smith*, 494 U.S. at 879 ("[T]he right to free exercise does not relieve an

---

[19]The Free Exercise Clause applies to states and local governments through the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

29

individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).").  The District Court concluded that "Act 169 is a neutral law of general applicability to all Pennsylvania home schoolers and their home education programs, with no reference or special impact on religious practices . . . ."  *Combs*, 468 F. Supp. 2d at 772.  As a result, the District Court applied the rational basis test to Parents' challenge of Act 169 and upheld the provision.  *Id.* at 777.

In *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004), we applied the standards for a neutral law of general applicability articulated by the Court in *Hialeah*.  First, a law must be both facially and actually neutral.  "A law is 'neutral' if it does not target religiously motivated conduct either on its face or as applied in practice."  *Blackhawk*, 381 F.3d at 209; *see also Hialeah*, 508 U.S. at 534 ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.  The Free Exercise Clause protects against governmental hostility which is masked, as well as overt.").  Second, the government cannot advance its interests solely by targeting religiously motivated conduct.  Instead, the regulation must be generally applicable.

> A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not

> religiously motivated and that undermines the
> purposes of the law to at least the same degree as
> the covered conduct that is religiously motivated.

*Blackhawk*, 381 F.3d at 209; *see also Hialeah*, 508 U.S. at 543 ("The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause.").

Act 169 is a neutral law of general applicability. It neither targets religious practice nor selectively imposes burdens on religiously motivated conduct. Instead, it imposes the same requirements on parents who home-school for secular reasons as on parents who do so for religious reasons. Furthermore, nothing in the record suggests Commonwealth school officials discriminate against religiously motivated home education programs (e.g., denying approval of home education programs because they include faith-based curriculum materials).

Parents contend Act 169 is not a law of general applicability and is tantamount to a licensing scheme for home-schooling. They cite *Blackhawk*, 381 F.3d at 209-10, for the proposition "that a statute with a waiver mechanism creates a regime of individualized, discretionary exemptions that triggers strict scrutiny." Parents Reply Br. at 8-9. Parents' depiction of Act 169 is mistaken and their reliance on *Blackhawk* is misplaced.

31

As noted, there are four ways to fulfill the compulsory education requirement. None of the options is an exemption from the compulsory education law. All four require that a child be educated in the required subjects for the required period. Furthermore, all parents who choose the home education program alternative, whether for religious or secular reasons, are required to fulfill the Act 169 requirements. Parents cite no statutory waiver mechanism that gives the school districts the authority to waive or exempt some parents from the disclosure and review requirements.

In *Blackhawk*, the Pennsylvania Wildlife Code contained specific statutory exemptions authorizing the director of the Game Commission to waive a permit fee "where hardship or extraordinary circumstance warrants." *Id.* at 205. Further, the court stated: "[w]e are not presented here with a neutral and generally applicable [provision] that is uniformly imposed without allowing individualized exemptions. Under *Smith*, such a scheme . . . would not trigger strict scrutiny, and a person seeking to be excused [from the provision's requirements] on religious grounds would be unlikely to prevail." *Id.* at 212. Act 169 is a neutral law of general applicability and does not allow individualized exemptions. *Blackhawk* is distinguishable.

Since Act 169 is a neutral law of general applicability, we will apply rational basis review unless an exception to the *Smith* rule applies. "[R]ational basis review requires merely that the action be rationally related to a legitimate government objective." *Tenafly Eruv Ass'n, Inc. v. Tenafly*, 309 F.3d 144,

32

165 n.24 (3d Cir. 2002). "Under rational basis review, 'a statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not that basis has a foundation in the record.'" *Lighthouse Inst.*, 510 F.3d at 277 (quoting *Heller v. Doe*, 509 U.S. 312, 321 (1993)).

The Commonwealth has a legitimate interest in ensuring children taught under home education programs are achieving minimum educational standards and are demonstrating sustained progress in their educational program. *See, e.g., Bd. of Educ. v. Allen*, 392 U.S. 236, 245-47 & n.7 (1968) ("[A] substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction . . . . [I]f the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function."); *Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534 (1925) (acknowledging the "power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils"). In *Brown v. Board of Education*, the Supreme Court noted the importance of education and the meaningful role the state plays in preparing a child for citizenship and adult life:

Today, education is perhaps the most important

33

> function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society.  It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.  In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

347 U.S. 483, 493 (1954).  Act 169's disclosure requirements and corresponding school district review rationally further these legitimate state interests.  Accordingly, Act 169 survives rational basis review.

B.

Parents assert their claim falls within a "hybrid-rights" exception the Supreme Court discussed in *Smith*:

> The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause

34

alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, *see Cantwell v. Connecticut*, [310 U.S., at 304-307] (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); *Murdock v. Pennsylvania*, [319 U.S. 105 (1943)] (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); *Follett v. McCormick*, [321 U.S. 573 (1944)] (same), or the right of parents, acknowledged in *Pierce v. Society of Sisters*, [268 U.S. 510 (1925)], to direct the education of their children, *see Wisconsin v. Yoder*, [406 U.S. 205 (1972)] (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school).

*Smith*, 494 U.S. at 881. Parents contend Act 169 substantially burdens both their free exercise of religion and their fundamental right as parents, under the Fourteenth Amendment, to direct the education and upbringing of their children. Accordingly, they invoke the hybrid-rights exception of *Smith*, seeking strict scrutiny review. Alternatively, Parents contend that, notwithstanding our hybrid-rights determination, *Wisconsin v. Yoder* remains good law and the same constitutional test

applies here.

1.

Although we have discussed the *Smith* hybrid-rights theory in prior opinions, its meaning and application remains an open question in our circuit. *See Blackhawk*, 381 F.3d at 207 (noting, while discussing *Smith*, "the Court did not overrule prior decisions in which 'hybrid claims' . . . had prevailed against 'neutral, generally applicable laws,'" but deciding case on other grounds); *Tenafly*, 309 F.3d at 165 n.26 (noting "[s]trict scrutiny may . . . apply when a neutral, generally applicable law incidentally burdens" hybrid rights); *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 200 (3d Cir. 1990) (finding "[b]ecause the present controversy does not concern any state action directly addressed to religion, [The Salvation Army] cannot receive protection from the associational right derived from the free exercise clause"). We have never decided a case based on a hybrid-rights claim, let alone the type of a hybrid-rights claim invoked here – one based on the Free Exercise Clause and the companion right to direct a child's upbringing.

*Smith*'s hybrid-rights theory has divided our sister circuits. Some characterize the theory as dicta and others use different standards to decide whether a plaintiff has asserted a cognizable hybrid-rights claim. The United States Courts of Appeals for the Second and Sixth Circuits have concluded the hybrid-rights language in *Smith* is dicta. *See Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003) (citing *Knight v.*

36

*Connecticut Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001)); *Watchtower Bible & Tract Soc'y of New York, Inc. v. Stratton*, 240 F.3d 553, 561-62 (6th Cir. 2001), *rev'd on other grounds*, 536 U.S. 150 (2002); *Kissinger v. Bd. of Trs. of Ohio State Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 180 (6th Cir. 1993). Furthermore, the United States Court of Appeals for the Sixth Circuit views the hybrid-rights exception as "completely illogical," *Kissinger*, 5 F.3d at 180, and the United States Court of Appeals for the Second Circuit "can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated," *Leebaert*, 332 F.3d at 144.[20] Accordingly, when faced

---

[20]Justice Souter, concurring in *Hialeah*, also criticized the hybrid-rights theory:

> [T]he distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule, and, indeed, the hybrid exception would cover the situation exemplified by *Smith*, since free speech and associational rights are certainly implicated in the peyote ritual. But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason

with a neutral law of general applicability, both appellate courts decline to allow the application of strict scrutiny to hybrid-rights claims and instead apply *Smith*'s rational basis standard.  *See Leebaert*, 332 F.3d at 144 ("'[A]t least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard' to evaluate hybrid claims." (quoting *Kissinger*, 5 F.3d at 180)).

The United States Courts of Appeals for the First Circuit and District of Columbia have acknowledged that hybrid-rights claims may warrant heightened scrutiny, but have suggested that a plaintiff must meet a stringent standard: the free exercise claim must be conjoined with an independently viable companion right.  *See Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) (rejecting the "hybrid claim" argument that "the combination of two untenable claims equals a tenable one"); *E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) (finding that the EEOC's violation of the Establishment Clause triggered the hybrid-rights exception); *Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 18-19 (1st Cir. 2004) (citing *Gary S. v. Manchester Sch. Dist.*, 241 F. Supp. 2d 111, 121 (D.N.H. 2003)) (affirming, for the same reasons, the district court's rejection of a hybrid-rights claim because the free

for the Court in what *Smith* calls the hybrid cases to have mentioned the Free Exercise Clause at all. *Hialeah*, 508 U.S. at 567 (Souter, J., concurring).

38

exercise claim was not conjoined with an independently viable companion claim); *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 539 (1st Cir. 1995) (rejecting a hybrid-rights claim because "[plaintiff's] free exercise challenge is . . . not conjoined with an independently protected constitutional protection").[21]

---

[21]In *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008), the United States Court of Appeals for the First Circuit rejected plaintiff parents' claims that they must be given prior notice by a public school and an opportunity to exempt their young children from reading books the parents find religiously repugnant.   In discussing hybrid-rights claims, the court stated that the strength of the companion constitutional claim required to establish a hybrid situation remains unsettled in the First Circuit because the *Brown* opinion did not "explicitly" decide the issue.   *Id.* at 98 n.9.   It also noted that "the parental rights claim asserted in that case was found to be so weak that it was not a colorable claim, much less an independently viable one."   *Id.*   The *Parker* court chose not to "enter[] the fray over the meaning and application of *Smith*'s 'hybrid situations' language," and instead "approach[ed] the parents' claims as the Court did in *Yoder*.   In that case, the Court did not analyze separately the due process and free exercise interests of the parent-plaintiffs, but rather considered the two claims interdependently, given that those two sets of interests inform one other."   *Id.* at 98.   The court ultimately found that plaintiffs did not describe "a constitutional burden on their rights" and affirmed the district court's dismissal

This stringent approach requiring an independently valid companion claim has received criticism, most notably that such a requirement would make the free exercise claim superfluous. *See Hialeah*, 508 U.S. at 567 (Souter, J., concurring) ("[I]f a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what *Smith* calls the hybrid cases to have mentioned the Free Exercise Clause at all."); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1296-97 (10th Cir. 2004) ("[I]t makes no sense to adopt a strict standard that essentially requires a *successful* companion claim because such a test would make the free exercise claim unnecessary. If the plaintiff's additional constitutional claim is successful, he or she would typically not need the free exercise claim and the hybrid-rights exception would add nothing to the case.").

The United States Courts of Appeals for the Ninth and Tenth Circuits[22] recognize hybrid rights and require a plaintiff

---

for failure to state a claim. *Id.* at 99.

[22]Although the United States Court of Appeals for the Seventh Circuit has not definitively articulated its approach, it has approvingly quoted the United States Court of Appeals for the Ninth Circuit. *See Civil Liberties for Urban Believers v. Chicago*, 342 F.3d 752, 765 (7th Cir. 2003) (quoting *Miller v. Reed*, 176 F.3d 1202, 1207-08 (9th Cir. 1999)); *but see id.*

to raise a "colorable claim that a companion right has been violated." *San Jose Christian Coll. v. Morgan Hill*, 360 F.3d 1024, 1032 (9th Cir. 2004); *see also Axson-Flynn*, 356 F.3d at 1297. They define colorable as "a fair probability or a likelihood, but not a certitude, of success on the merits." *San Jose Christian Coll.*, 360 F.3d at 1032; *Axson-Flynn*, 356 F.3d at 1297. They characterize this fact-driven, case-by-case inquiry as "a middle ground between two the extremes of painting hybrid-rights claims too generously and construing them too narrowly." *Axson-Flynn*, 356 F.3d at 1295. A plaintiff cannot "simply invoke the parental rights doctrine, combine it with a claimed free-exercise right, and thereby force the government to demonstrate the presence of a compelling state interest." *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 700 (10th Cir. 1998). Nor is one required to establish that the challenged law independently violates a companion constitutional right alone, without any recognition of the Free Exercise Clause.

By requiring a "colorable claim" that a companion right

_____

(citing *Brown*, 68 F.3d at 539 and *Kissinger*, 5 F.3d at 180). The United States Court of Appeals for the Eighth Circuit has recognized the existence of hybrid rights but has not defined the contours of the analysis. *See Cornerstone Bible Church v. Hastings*, 948 F.2d 464, 474 (8th Cir. 1991) (reversing and remanding to district court to consider hybrid-rights claim).

41

has been violated, the United States Courts of Appeals for the Ninth and Tenth Circuits examine "the claimed infringements on the party's claimed rights to determine whether either the claimed rights or the claimed infringements are genuine." *Swanson*, 135 F.3d at 699. Thus, in order to trigger heightened scrutiny, a hybrid-rights plaintiff must show a fair probability or likelihood, but not a certitude, of success on the merits of his companion constitutional claim.

In *Smith*, the Court asserted that the case before it "[did] not present . . . a hybrid situation, but a free exercise claim unconnected with any communicative activity or parental right." 494 U.S. at 882. The criterion applicable to a free exercise claim combined with a companion constitutional right was left undefined. *See, e.g.*, *Kissinger*, 5 F.3d at 180 (noting that the *Smith* Court "did not explain how the standards under the Free Exercise Clause would change depending on whether other constitutional rights are implicated"). Since *Smith*, a majority of the Court has not confirmed the viability of the hybrid-rights theory.[23] Until the Supreme Court provides direction, we

---

[23]As noted, Justice Souter, concurring in *Hialeah*, criticized the hybrid-rights theory. *Hialeah*, 508 U.S. at 566-67 (Souter, J., concurring). Furthermore, in *Boerne v. P.F. Flores*, 521 U.S. 507 (1997), the Court noted, without further discussion or explanation, that *Yoder* "implicated" the right to free exercise of religion and the right of parents to control their children's education. *Boerne*, 521 U.S. at 514.

believe the hybrid-rights theory to be dicta.

2.

Even if we were to apply the approaches used by our sister circuits – "colorable" claim approach and independently viable claim approach – we would find Parents' arguments unconvincing.  Under either approach, we must determine whether Parents can establish a hybrid-rights claim by asserting combined violations of the Free Exercise Clause and the companion right of a parent under the Fourteenth Amendment to direct a child's education.  Parents have not presented an independent or colorable companion claim and, accordingly, cannot establish a valid hybrid-rights claim.

"The Due Process Clause guarantees more than fair process . . . . The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997).  In *Glucksberg*, the Supreme Court articulated the fundamental rights protected by the Due Process Clause.  *Id.* at 719-20.  Included in the list was the right "to direct the education and upbringing of one's children."  *Id.* at 720 (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510 (1925)); *see also Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) ("[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their

43

children.").

Parents rely on three Supreme Court cases to generally identify a parent's constitutional right to direct a child's education. *See Meyer v. Nebraska*, 262 U.S. 390, 401-03 (1923) (holding state law prohibiting foreign language instruction violated the "power of parents to control the education of their own"); *Pierce*, 268 U.S. at 535-36 (holding state compulsory education law requiring students to attend solely public schools "unreasonably interferes with the liberty of parents . . . to direct the upbringing and education of children under their control"); *Wisconsin v. Yoder*, 406 U.S. 205, 214, 234-36 (1972) (finding a compulsory education system, as applied to the Amish, to violate the Free Exercise Clause and the "traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce*, 'prepare (them) for additional obligations'"). But the particular right asserted in this case – the right to be free from all reporting requirements and "discretionary" state oversight of a child's home-school education – has never been recognized.

Although Parents assert the fundamental nature of their general right, it is a limited one. We have noted "[t]he Supreme Court has never been called upon to define the precise boundaries of a parent's right to control a child's upbringing and education. It is clear, however, that the right is neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005). "The case law in this area establishes that parents simply do not have a constitutional right to control

44

each and every aspect of their children's education and oust the state's authority over that subject." *Swanson*, 135 F.3d at 699.[24] Furthermore,

> [t]he Court has repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by reasonable government regulation.

---

[24]Federal courts addressing the issue have held that parents have no right to exempt their child from certain subjects, reading assignments, community-service requirements or assembly programs they find objectionable. *See, e.g., Parker*, 514 F.3d at 107 (reading assignment); *Leebaert*, 332 F.3d at 144 (health education class); *Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174 (4th Cir. 1996) (community-service requirement); *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 461-62 (2d Cir. 1996) (community-service requirement); *Brown*, 68 F.3d at 539 (sexual education assembly); *see also Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) (finding that a parent "does not have a fundamental right to exempt his child from the school dress code").

45

*Runyon v. McCrary*, 427 U.S. 160, 178 (1976).[25]

In addition to *Yoder*, discussed *infra*, Parents rely on *Meyer* and *Pierce* for foundational support. Read together, the cases

> evince the principle that the state cannot prevent parents from choosing a specific educational program – whether it be religious instruction at a private school or instruction in a foreign language. That is, the state does not have the power to "standardize its children" or "foster a homogenous people" by completely foreclosing the opportunity of individuals and groups to choose a different path of education.

*Brown*, 68 F.3d at 533; *see also Runyon*, 427 U.S. at 177 (stressing the "limited scope" of *Meyer* and *Pierce*). In the present case, Parents are given the freedom to choose a "different path of education" – home-schooling – subject only to the Act 169 requirements. The school districts do not have any role in selecting the program Parents wish to follow.

---

[25]Parents who home-school their children may be subjected to standardized testing to ensure the children are receiving an adequate education. *See Murphy v. Arkansas*, 852 F.2d 1039, 1044 (8th Cir. 1988) (upholding state standardized test requirement over home-schooling parents' First and Fourteenth Amendment objections).

Parents are unable to point to a single instance in which the school districts have limited or interfered with their religious teachings and/or materials.

In her deposition, Shari Nelson acknowledged that her local school district never questioned or rejected her affidavits and did not interfere with her religious content choices. Mrs. Nelson noted she was never concerned that the local school district would reject her children's portfolio if it contained work product with a religious subject matter. Similarly, Maryalice Newborn acknowledged that her local school district never questioned the appropriateness of her home education program or its content.

Parents nevertheless contend that the Commonwealth's "subjective" and "discretionary" review over the Act 169 disclosures violates their right to control their children's education. They insist any review of the home education programs must be purely "objective." In other words, they contend the Commonwealth usurps the religious and parental rights of parents when an official makes a limited determination of whether a child has "sustained progress in the overall program." Parents have not articulated their definition of "objective" in their brief. When questioned during oral argument, Parents' counsel was unable or unwilling to provide a concrete explanation or example of an "objective" review. Furthermore, it is difficult to accept Parents' assertion that review of a child's educational progress can truly be objective. The grading of an essay, even on a pass/fail scale, will always

47

be imbued with some element of subjectivity.

As noted, there is no recognized right for parents to educate their children "unfettered by reasonable government regulation." *Runyon*, 427 U.S. at 178. The Court in *Pierce* expressly acknowledged "'the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils.'" *Id.* (quoting *Pierce*, 268 U.S. at 534); *see also Meyer*, 262 U.S. at 402 (noting "[t]he power of the state to compel attendance at some school and to make reasonable regulations for all schools . . . [was] not questioned" by the parties).[26] Furthermore, there is "a distinction between

_____

[26]In a different context, the Supreme Court stated:

Since *Pierce*, a substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction. Indeed, the State's interest in assuring that these standards are being met has been considered a sufficient reason for refusing to accept instruction at home as compliance with compulsory education statutes. These cases were a sensible corollary of *Pierce v. Society of Sisters*: if the State must satisfy its interest in secular education

actions that strike at the heart of parental decision-making authority on matters of the greatest importance and other actions that . . . are not of constitutional dimension." *C.N.*, 430 F.3d at 184. Parents identify the general right to control the education of one's child. But Parents do not have a constitutional right to avoid reasonable state regulation of their children's education. Act 169's reporting and superintendent review requirements ensure children taught in home education programs demonstrate progress in the educational program. The statute does not interfere, or authorize any interference, with Parents' religious teachings and/or use of religious materials. Parents' claim under the Fourteenth Amendment is of insufficient constitutional dimension to state either an independently viable or colorable claim. Accordingly, under both the stringent and colorable hybrid-rights approaches of our sister circuits, Parents have not asserted a "hybrid-rights claim."

3.

Parents also contend that, notwithstanding the different standards articulated by the circuits regarding hybrid-rights

---

through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular education function. *Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 245-47 (1968) (examining validity of a New York statute requiring school districts to purchase and loan textbooks to students enrolled in parochial schools).

49

claims, they raise the same type of claim as the parents in *Yoder*. They contend that since *Yoder* is still good law, parents claiming a religious-parental exemption to a neutral law of general applicability get the benefit of the traditional Free Exercise test. Parents assert that "it is beyond legitimate question that the same constitutional tests employed in *Yoder* must be used here to evaluate these Parents' religious-parental claims." Parents Br. at 27.

In *Yoder*, the Court granted a religious-based exception to a regulation of general applicability. *C.f.* John E. Nowak & Ronald D. Rotunda, Constitutional Law § 17.6 (7th ed. 2004) ("*Yoder* stands out as the one instance in which the Court required the government to grant to persons who could not comply with the law due to their religious beliefs an exemption from a law regulating the conduct of all persons . . . ."). But the unique burden suffered by the Amish, combined with the Supreme Court's limiting language, distinguish *Yoder* from this case.

In response to objections by Amish citizens, the *Yoder* Court held that the First Amendment required a partial exemption from a Wisconsin compulsory high-school education law requiring children to attend public or private school until age 16. The Amish refused to send their children, ages 14 and 15, to school after completion of the eighth grade of schooling. The Court noted the Amish's "convincing showing:"

the Amish in this case have convincingly

> demonstrated the sincerity of their religious
> beliefs, the interrelationship of belief with their
> mode of life, the vital role that belief and daily
> conduct play in the continued survival of Old
> Order Amish communities and their religious
> organization, and the hazards presented by the
> State's enforcement of a statute generally valid as
> to others.

*Yoder*, 406 U.S. at 235. The Court applied a heightened level of scrutiny and found the State's interest lacking. *Id.* at 235-36.

Parents favor a broad reading of *Yoder* and insist that it applies to all citizens. But *Yoder*'s reach is restricted by the Court's limiting language and the facts suggesting an exceptional burden imposed on the plaintiffs. In *Yoder*, the religious beliefs of the Amish were completely integrated with their community and "mode of life."[27] *Yoder*, 406 U.S. at 235. As a result, compulsory attendance would "substantially interfer[e] with the religious development of the Amish child and his integration into the way of life of the Amish faith community." *Id.* at 218. Accordingly, the Wisconsin law carried "a very real threat of undermining the Amish community and religious practice," *id.*, and placed the continued survival of

---

[27]This "mode of life" reference in *Yoder* has been interpreted to refer to a distinct community and way of life, not simply the centrality of one's belief to his or her faith. *See Parker*, 514 F.3d at 100.

51

Amish communities in "danger," *id.* at 218 n.9. Compulsory attendance "prevented these Amish parents from making *fundamental* decisions regarding their children's religious upbringing and effectively overrode their ability to pass their religion on to their children, as their faith required." *Parker*, 514 F.3d at 99-100 (citing *Yoder*, 406 U.S. at 233-35).

Before applying a heightened level of scrutiny, the Court wanted to ensure that the "Amish religious faith and their mode of life are, as they claim, inseparable and interdependent." *Yoder*, 406 U.S. at 215. Recognizing the exceptional nature of the Amish's showing, the Court held: "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Id.* at 233; *see also Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058, 1067 (6th Cir. 1987) ("*Yoder* rested on such a singular set of facts that we do not believe it can be held to announce a general rule . . . .").

The United States Court of Appeals for the Second Circuit has interpreted the central underpinning of *Yoder* to be the "threat to the Amish community's way of life, posed by a compulsory school attendance statute." *Leebaert*, 332 F.3d at 144. In *Leebaert*, a parent alleged a violation of the First and Fourteenth Amendments because a school refused to excuse his son from a mandatory health and education course. While not questioning the sincerity of the parent's beliefs, the Second

52

Circuit found the claims were not governed by *Yoder*. *See id.* (plaintiff did not allege that "his community's entire way of life is threatened;" plaintiff "does not assert that there is an irreconcilable *Yoder*-like clash between the essence of [plaintiff's] religious culture and the mandatory health curriculum that he challenges"); *see also Brown*, 68 F.3d at 539 (distinguishing *Yoder* because a one-time compulsory attendance at a health program did not threaten "their entire way of life").

In the pre-*Smith* case *New Life Baptist Church Academy v. East Longmeadow*, 885 F.2d 940 (1st Cir. 1989), a religious school asserted a remarkably similar claim to Parents' claim. The New Life Baptist Church Academy refused to comply with state rules and procedures for determining the adequacy of the secular education provided by the school because it believed "it is a sin to 'submit' [its] educational enterprise to a secular authority for approval." *Id.* at 941. Finding that "the weight of legal precedent is strongly against the Academy's position," *id.* at 950, the United States Court of Appeals for the First Circuit concluded that "this case differs significantly from [*Yoder*]," *id.* at 951.[28] It noted that the state's procedures

_____

[28]As noted, *New Life Baptist Church Academy* was decided before *Smith*. Accordingly, the First Circuit applied the *Sherbert* test, *New Life Baptist Church Acad.*, 885 F.2d at 944 (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)), and analyzed *Yoder* within the "less restrictive alternative" context. *New Life*

do not threaten interference with religious practices, prayer, or religious teaching; and the record, while indicating a sincere religious scruple, does not suggest that enforcement of the [state] procedures would destroy a religious community's way of life. Nor does the record support the view that the Academy, left on its own, would provide "ideal" or even adequate secular education. All these factors make this case quite unlike *Yoder*.

*Id.* (citations omitted).

Similarly, the claim raised by the Amish parents in *Yoder* can be distinguished from the claim raised by Parents here. Act 169 does not threaten Parents' or their community's entire mode of life. Even though Parents are required to keep records and submit them for review, they are in complete control of the religious upbringing of their children. In fact, Parents are unable to point to even one occasion in which the school districts have questioned their religious beliefs, texts, or teachings.

The dispute in *Yoder* involved an additional one or two years of education at public schools versus "vocational" education at home. The Amish allowed their children to attend

---

*Baptist Church Acad.*, 885 F.2d at 948-52. Despite this, we find the First Circuit's discussion of *Yoder* to be informative.

public schools until eighth grade and sought only a partial exemption from the state's compulsory school attendance law. Furthermore, the Court in *Yoder* assumed the state would regulate the Amish's home education to ensure the satisfaction of educational standards. *See Yoder*, 406 U.S. at 236 ("The States have had a long history of amicable and effective relationships with church-sponsored schools, and there is no basis for assuming that, in this related context, reasonable standards cannot be established concerning the content of the continuing vocational education of Amish children under parental guidance . . . ."). In contrast, Parents request a full exemption from Act 169, seeking to administer their children's entire primary and secondary education without any review by the Commonwealth. They cite *Yoder* to challenge the government's authority to engage in the regulation and discretionary review of their home education programs.[29]

---

[29]In *Duro v. Dist. Attorney, Second Judicial Dist.*, 712 F.2d 96 (4th Cir. 1983), plaintiffs, who home-schooled their children, alleged that the state compulsory school attendance law infringed upon their religious beliefs. The district court, relying heavily upon *Yoder*, found the state law unconstitutional as applied to the plaintiffs. The Fourth Circuit reversed, distinguishing *Yoder*. *Duro*, 712 F.2d at 98-99.

> [I]n *Yoder*, the Amish children attended public school through the eighth grade and then obtained informal vocational training to enable them to assimilate into the self-contained Amish

Parents' claim is distinguishable from the Amish parents' claim in *Yoder*.

C.

Since Act 169 survives rational basis review and since Parents have failed to establish that an exception to *Smith*'s neutral law of general applicability rule applies, Parents' federal constitutional claims fail.

--------

> community.   However, in the present case, [plaintiff] refuses to enroll his children in any public or nonpublic school for any length of time, but still expects them to be fully integrated and live normally in the modern world upon reaching the age of 18.

Id. at 98.

Although Parents contend they can "readily demonstrate" that their children will be self-sufficient even if they do not submit their children's work on an annual basis to a government official for his review, Parents Br. at 31, their claim remains distinguishable.  The Amish allowed their children to attend public schools until the completion of 8th grade.  Therefore, the State was assured that the Amish children received a state approved education and the Court found an additional one or two years of compulsory formal education to be insufficient to overcome the Amish's interests.  In this case, Parents seek to home-school their children for their entire primary and secondary education.

56

IV.

In addition to their federal constitutional claims, Parents assert a state statutory claim under the Religious Freedom Protection Act, 71 Pa. Stat. Ann. §§ 2401–2407.  In order to obtain relief under RFPA, Parents must prove by clear and convincing evidence that their "free exercise of religion has been burdened or likely will be burdened in violation of [§ 2404]."[30]  *Id.* § 2405(f).  If Parents satisfy this burden, the school districts are required to prove, by a preponderance of the evidence, that Act 169 furthers a compelling interest and is the least restrictive means of furthering the interest.  71 Pa. Stat.

---

[30] Section 2404 states:

(a) General rule.  Except as provided in subsection (b), an agency shall not *substantially burden* a person's free exercise of religion, including any burden which results from a rule of general applicability.

(b) Exceptions.  An agency may *substantially burden* a person's free exercise of religion if the agency proves, by a preponderance of the evidence, that the burden is all of the following:

(1) In furtherance of a compelling interest of the agency.

(2) The least restrictive means of furthering the compelling interest.

*Id.* § 2404 (emphases added).

57

Ann. § 2404(a)–(b).  Thus, as a threshold matter, Parents must prove, by clear and convincing evidence, that their free exercise of religion has or will likely be "substantially burdened."[31]

The District Court concluded Parents failed to establish by clear and convincing evidence that Act 169 substantially burdens their free exercise of religion.  *Combs*, 468 F. Supp. 2d at 771.  It granted the school districts' motion for summary judgment on both the facial and as-applied challenges based on the RFPA.  *Id.*  Parents assert error, contending the District Court either failed to review or misapplied the actual text of the statute.  Further, they argue that because the fourth definition of "substantially burden" is clear and unambiguous, the District Court improperly resorted to extraneous sources like legislative history and federal cases interpreting the federal Free Exercise

---

[31]As noted, RFPA defines "substantially burden" as:

> An agency action which does any of the following: (1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs.  (2) Significantly curtails a person's ability to express adherence to the person's religious faith.  (3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion.  (4) Compels conduct or expression which violates a specific tenet of a person's religious faith.

71 Pa. Stat. Ann. § 2403.

58

Clause and the federal Religious Freedom Restoration Act.

Parents invoke the fourth definition of "substantially burden" – "[c]ompels conduct or expression which violates a specific tenet of a person's religious faith." 71 Pa. Stat. Ann. § 2403. Parents contend Act 169 compels "conduct or expression" by requiring them to submit the content and records of their children's educational progress to the school districts. Because these submissions are subject to review and approval by the school districts, Parents contend Act 169 violates a "specific tenet" of their religious faith – that "education of their children, not merely the 'religious education,' is 'religion' and is assigned by God to the jurisdiction of the family." Parents Br. at 64.

The construction and application of RFPA's fourth definition of "substantially burden" is an issue of first impression[32] and a matter of Pennsylvania law. As noted, the District Court's jurisdiction was based upon 28 U.S.C. §§ 1331,

---

[32]In 2007, the Commonwealth Court of Pennsylvania interpreted the third definition of substantially burden – "[d]enies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion." *Ridley Park United Methodist Church v. Zoning Hearing Bd. Ridley Park Borough* (*Ridley Park*), 920 A.2d 953, 957-61 (Pa. Commw. Ct. 2007). The court concluded that because "daycare is not a fundamental religious activity of a church," the Zoning Hearing Board erroneously applied RFPA. *Id.* at 960.

1343(a)(3), 1367 and 1441.  Because we affirm the District Court's grant of summary judgment on all of Parents' federal claims, only their state law claim remains.  Under 28 U.S.C. § 1367(c),  "district courts may decline to exercise supplemental jurisdiction" over a state law claim if "the claim raises a novel or complex issue of State law . . . [or] the district court has dismissed all claims over which it has original jurisdiction." *Id.* Section 1367(c) provides courts "the discretion to refuse to exercise supplemental jurisdiction when 'values of judicial economy, convenience, fairness, and comity' counsel that the district court remand state claims to a state forum." *Hudson United Bank v. LiTenda Mortgage Corp.*, 142 F.3d 151, 157 (3d Cir. 1998) (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).  A decision to remand under section 1367 "reflects the court's judgment . . . that at the present stage of litigation it would be best for supplemental jurisdiction to be declined so that state issues may be adjudicated by a state court." *Hudson United Bank*, 142 F.3d at 158 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966)).

Parents' only remaining claim involves the interpretation of a state statute on which there is no Pennsylvania precedent. Because all federal issues have been decided on summary judgment and since Parents' RFPA claim raises a novel and potentially complex issue of State law, we will decline to exercise supplemental jurisdiction over Parents' pendent state

law claim.  28 U.S.C. § 1367(c).[33]

## V.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of the school districts on Parents' federal constitutional claims, vacate the District Court's holding regarding the pendent RFPA claim, and remand the case to the District Court with instructions to remand the RFPA claim to state court.

---

[33]*Shaffer v. Board of School Directors of Albert Gallatin Area School District*, 730 F.2d 910 (3d Cir. 1984), a pre-section 1367 decision, supports this conclusion.  In *Shaffer*, we found that "where the underlying issue of state law is a question of first impression with important implications for public education in Pennsylvania, factors weighing in favor of state court adjudication certainly predominate."  *Id.* at 913.

SCIRICA, *Chief Judge*, concurring.

Section 1367(c) provides: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if (1) the claim raises a novel or complex issue of State law . . . [or] (3) the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c). The District Court here exercised supplemental jurisdiction over Parents' state law Religious Freedom Protection Act claim. The claim was fully presented to and adjudicated by the District Court. I would decide the issue.

As noted, in order to obtain relief under RFPA, Parents must prove by clear and convincing evidence that their free exercise of religion has been substantially burdened or likely will be substantially burdened. *Id.* § 2404, 2405(f). If Parents satisfy this burden, the school districts are required to prove, by a preponderance of the evidence, that Act 169 furthers a compelling interest and is the least restrictive means of furthering the interest. 71 Pa. Stat. Ann. § 2404(a)–(b). Thus, as a threshold matter, Parents must prove, by clear and convincing evidence, that their free exercise of religion has or will likely be "substantially burdened."

Parents have made conflicting claims as to what conduct or review by the school districts constitutes a substantial burden. In their complaint, Parents challenge all state review of their

62

home education programs.[34]  But deposition testimony reveals some variance by Parents on the permissible level of state oversight.[35]  Nevertheless, in their District Court briefs, Parents again contended that "placing of authority in any state agency violates their sincerely held religious beliefs" and that "it is a

---

[34]*See, e.g.,* Combs Compl. ¶ 12 ("Mr. and Mrs. Combs' religious beliefs acknowledge that the civil government may require them to educate their children, but, according to their religious belief, the civil government lacks jurisdiction to approve or administratively supervise the education they provide."); Combs Compl. ¶ 14 ("It is a specific tenet of Mr. and Mrs. Combs' religious faith, rooted in their understanding of the Bible, that it would be sinful for them to engage in conduct or expression that would grant control over their children's education to the civil government."); Hankin Compl. ¶ 20 ("It is a specific tent of Mr. and Mrs. Hankin's religious faith, rooted in their understanding of the Bible, that it would be sinful for them to have any association with the public school system.").

[35]*See, e.g.*, Maryalice Newborn Dep. at 49, Aug. 30, 2005 ("Q: What level of state review would be acceptable to you?  A: None."); Thomas Hankin Dep. at 55, Sept. 6, 2005, ("I personally believe that if the discretion of the school district were removed, there would be a lot less trouble religiously with my beliefs; that is, if I submitted to the school district a statement that said . . . I am educating my children and this is what I'm teaching them this year.").

63

specific tenet of their religious faith that the State lacks the jurisdiction over education and the family that Act 169 asserts." Parents Br. Opp'n to Def.'s Mot. Summ. J. at 9-10, Apr. 14, 2006.[36]  At oral argument, however, Parents' counsel again shifted the focus of their claims and appeared to concede that the objectionable portion of Act 169 was not the record keeping, testing, or third party evaluation, but the school districts' independent, "discretionary" review of their children's educational progress.  But assuming a proper concession, this possible alteration of the claim was not made before the District Court.

## I.

As noted, the construction and application of RFPA's fourth definition of "substantially burden" is an issue of first impression.  Because this is a matter of Pennsylvania law, "we must predict how the Pennsylvania Supreme Court, if faced with the identical issue, would construe the statute."  *Prudential Prop. & Cas. Ins. Co. v. Pendleton*, 858 F.2d 930, 934 (3d Cir.

---

[36] *See also* Parents Br. Opp'n to Def.'s Mot. Summ. J. at 10, Apr. 14, 2006 ("Because Plaintiffs believe that *all* education is inherently religious, Caesar has no jurisdiction over it at all."); *id.* at 11 (citing Herbert W. Titus, founding dean of Regent University School of Law, for the proposition that "[b]oth the Establishment and the Free Exercise clauses preclude the civil government from exercising jurisdiction over the education of the people.").

1988).[37]

---

[37]The Commonwealth's rules of statutory construction, codified at 1 Pa. Cons. Stat. §§ 1901–1978, "shall be observed, unless the application of such rules would result in a construction inconsistent with the manifest intent of the General Assembly." *Id.* § 1901. "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." *Id.* § 1921(a).

Words and phrases are construed "according to their common and approved usage," whereas technical words which are defined will be construed according to their peculiar definitions. *Id.* § 1903. "When the words of the statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). The Pennsylvania Supreme Court "has repeatedly recognized that rules of construction, such as consideration of a statute's perceived 'object' or 'purpose,' are to be resorted to only when there is an ambiguity." *Commonwealth v. Taylor*, 841 A.2d 108, 112 (Pa. 2004). However,

> [w]hen the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters: (1) The occasion and necessity for the statute. (2) The circumstances under which it was enacted. (3) The mischief to be remedied. (4) The object to be attained. (5) The former law, if any, including other statutes upon the same or similar

65

In construing the meaning of "substantially burden," the District Court relied on the plain language of the statute, the analysis of "substantially burden" in the "context of Free Exercise Clause and similar freedom of religion restoration acts," and the intent of the General Assembly to restore the "traditional (pre-*Smith*) free exercise of religion standards." *Combs*, 468 F. Supp. 2d at 771. As noted, Parents contend the District Court either ignored or misapplied the plain language of the statute and improperly included legislative history and pre-*Smith* decisions in its analysis.

II.

Parents rely exclusively upon the RFPA's fourth definition of "substantially burden" – "an agency action which . . . [c]ompels conduct or expression which violates a specific tenet of a person's religious faith." 71 Pa. Stat. Ann. § 2403. Parents contend they are compelled, under threat of truancy charges, to submit the portfolio of their children's work product to the school districts for discretionary review. Parents describe the act of turning over the portfolio for discretionary review as "conduct or expression." They point to the exercise of editorial judgment and creativity on the part of the home education

---

subjects. (6) The consequences of a particular interpretation. (7) The contemporaneous legislative history. (8) Legislative and administrative interpretations of such statute. 1 Pa. Cons. Stat. § 1921(c).

supervisor as evidence of this expression.[38]  Moreover, Parents
assert a "specific tenet" based upon certain religious beliefs.

First, Parents maintain their faith teaches that "education
of their children, not merely the 'religious education,' is
'religion.'"   Parents Br. at 64.   Parents cite, *inter alia*,
*Deuteronomy* 6:5-7 (NIV) ("Love the Lord your God with all
your heart and with all your soul and with all your strength.
These commandments that I give you today are to be upon your
hearts.  Impress them on your children.  Talk about them when
you sit at home and when you walk along the road, when you lie
down and when you get up."), *Psalms* 145:4 (NIV) ("One
generation will commend your works to another; they will tell
of your mighty acts."), *Ephesians* 6:4 (NIV) ("Fathers, do not
exasperate your children; instead, bring them up in the training
and instruction of the Lord."), and *Proverbs* 22:6 ("Train up a
child in the way he should go and when he is old, he will not
depart from it."), for the proposition that God has directly called
upon them to home educate their children.

Second, Parents contend God has assigned religious
matters to the exclusive jurisdiction of the family, citing, *inter
alia*, *Luke* 20:25 ("Then render to Caesar the things that are
Caesar's, and to God the things that are God's."), *Pslams* 127:3
(NIV) ("Sons are a heritage from the Lord, children a reward
from him."), *Matthew* 7:6 ("Don't give what is holy to unholy

---

[38]I assume, without deciding, that Parents' actions are
"conduct or expression" within the meaning of the RFPA.

67

people."), 1 *Corinthians* 10:31 ("Whatever you do, do it all for
the glory of God."), 2 *Timothy* 2:15 ("Be diligent to present
yourself approved to God."), 1 *Thessalonians* 2:4 ("We are not
trying to please men but God, who tests our hearts."), and *Acts*
5:29 ("We must obey God rather than men.").  Parents contend
Act 169 replaces the headship of Christ over the family, and
their headship over their children, with the headship of the state
over the family, citing, *inter alia*, 1 *Corinthians* 11:3 (NIV)
("Now I want you to realize that the head of every man is Christ,
and the head of the woman is man, and the head of Christ is
God."), *Ephesians* 5:23 (NIV) ("For the husband is the head of
the wife as Christ is the head of the church, his body, of which
he is the Savior."), and *Ephesians* 6:1 (NIV) ("Children, obey
your parents in the Lord, for this is right.").[39]  As a result of this

--------

[39]The Previshes also cite the Catechism of the Roman
Catholic Church.  *See, e.g., Catechism* 2223 ("Parents have the
first responsibility for the education of their children.  They bear
witness to this responsibility first by creating a home where
tenderness, forgiveness, respect, fidelity, and disinterested
service are the rule.  The home is well suited for education in the
virtues.  This requires an apprenticeship in self-denial, sound
judgment, and self-mastery – the preconditions of all true
freedom.  Parents should teach their children to subordinate the
'material and instinctual dimensions to interior and spiritual
ones.'"); *Catechism* 2229 ("As those first responsible for the
education of their children, parents have the right to choose a
school for them which corresponds to their own convictions.

"specific tenet," Parents assert a sincerely held religious belief that the school districts have no authority to compel reporting or to engage in discretionary review of their home education program.

The term "specific tenet" is not defined in the Religious Freedom Protection Act or 1 Pa. Cons. Stat. § 1991.[40]  The Oxford English Dictionary defines "specific" as "precise or exact in respect of fulfilment, conditions, or terms; definite, explicit" and "exactly named or indicated, or capable of being so; precise, particular."  2 Oxford English Dictionary 2949 (Compact ed. 1971); *see also* Merriam-Webster's Dictionary 1132 (9th ed. 1990) (defining "specific" as "sharing or being those properties of something that allow it to be referred to a particular category" or as "free from ambiguity").  "Tenet" is defined as "[a] doctrine, dogma, principle, or opinion, in religion, philosophy, politics or the like, held by a school, sect, party, or person."  2 Oxford English Dictionary 3260 (Compact ed. 1971); *see also* Merriam-Webster's Dictionary 1215 (9th ed.

---

This right is fundamental.  As far as possible parents have the duty of choosing schools that will best help them in their task as Christian educators.   Public authorities have the duty of guaranteeing this parental right and of ensuring concrete conditions for its exercise.").

[40]Section 1991 defines words and phrases for "any statute finally enacted on or after September 1, 1937."

69

1990) (defining "tenet" as "a principle, belief, or doctrine generally held to be true; especially: one held in common by members of an organization, group, movement, or profession").

In the religious context, the term "specific tenet" is difficult to define.[41]  Even though a religious concept may be stated generally, it may, in the believer's mind, be a specific religious tenet.  At one end of the spectrum, specificity may be relatively straightforward and easy to identify because the "specific tenet" is observed as an outward manifestation of a particular religious belief.  For example, in *Fraternal Order of Police Newark Lodge No. 12 v. Newark*, 170 F.3d 359 (3d Cir.

--------

[41]The words "specific," "specificity," and "particularity" are familiar terms in Pennsylvania and federal procedural law, and in that context, denote a heightened pleading standard as opposed to a more general (notice) standard.  *See, e.g.*, *Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346, 1352 (Pa. 1991) ("Both Rule 1019(b) of the Pennsylvania Rules of Civil Procedure and case law require that fraud be plead with specificity.  The appellees' complaint does not rise to the level of specificity that we require." (citation omitted)); *c.f. In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (noting, in the Private Securities Litigation Reform Act ("PSLRA") fraud context, that the PSLRA "echoes precisely Fed. R. Civ. P. 9(b) and therefore requires plaintiffs to plead 'the who, what, when, where, and how . . . .'" (citation omitted)).

1999), two Sunni Muslim officers successfully challenged an internal order requiring all police officers to shave their beards. Plaintiffs articulated a religious commandment to grow and wear a beard. *Id.* at 360-61; *see also Deveaux v. Philadelphia*, No. 3103 Feb. Term 2005, 2005 WL 1869666, at *1-2 (Pa. Com. Pl. July 14, 2005) (granting a preliminary injunction preventing the city from suspending a practicing Muslim firefighter without pay for refusing to shave his beard).  In *Sherbert v. Verner*, 374 U.S. 398 (1963), a member of the Seventh-day Adventist Church challenged state unemployment compensation rules that conditioned the availability of benefits upon her willingness to work under conditions forbidden by her religion.  The Court acknowledged that "the prohibition against Saturday labor is a basic tenet of the Seventh-day Adventist creed, based upon that religion's interpretation of the Holy Bible."  *Id.* at 399 n.1.

Furthermore, religious dietary laws would appear to qualify as specific tenets.  In *Williams v. Bitner*, 455 F.3d 186 (3d Cir. 2006), a Muslim inmate assigned to kitchen duty was disciplined for refusing to aid others in the consumption of pork. Citing the Koran ("He has forbidden you . . . the flesh of swine") and Chapter Eleven of Leviticus in the Old Testament, Williams averred that handling and serving pork would violate his religious faith.  *Id.* at 187.  Our court held that "prison officials must respect and accommodate, when practicable, a Muslim inmate's religious beliefs regarding prohibitions on the handling of pork" and affirmed the denial of qualified immunity.

71

*Id.* at 194.  *See also DeHart v. Horn*, 390 F.3d 262, 272-75 (3d Cir. 2004) (discussing a Buddhist prisoner's Religious Land Use and Institutionalized Persons Act claim based upon his request for a special diet).

At the other end of the spectrum are claims similar to Parents'.  These claims cite more general and less obviously manifested concepts.  This is not to undervalue these tenets which, as revelations, may be fundamental to one's religious beliefs.  In these situations, however, it may be difficult to determine whether a litigant's citations to scripture or to general religious concepts articulate a "specific tenet."    Also problematic in this analysis are religious tenets that may be viewed as both general and specific.  *See, e.g., Exodus* 20:7 ("Thou shalt not take the name of the LORD thy God in vain, for the LORD will not hold him guiltless that taketh his name in vain."); *Exodus* 20:12 ("Honor thy father and thy mother that thy days may be long upon the land which the LORD thy God giveth thee.").

Furthermore, the RFPA definition of "substantially burden" appears to create some tension between state and federal law.  The United States Supreme Court has cautioned against making religious interpretations in the First Amendment context.  *See, e.g., Smith*, 494 U.S. at 887 ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."); *id.* at 886-87 ("It is no more appropriate for judges to determine the 'centrality' of

72

religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field."); *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 715 (1981) ("Courts should not undertake to dissect religious beliefs . . . because [the believer's] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ."); *id.* at 716 ("Courts are not arbiters of scriptural interpretation.").  Additionally,  the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5, "does not permit a court to determine whether the belief or practice in question is 'compelled by, or central to, a system of religious belief.'" *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007) (quoting 42 U.S.C. § 2000cc-5(7)(A)).

Nevertheless, the Pennsylvania General Assembly's statutory definition of "substantially burden" appears to require courts to inquire into, *inter alia*, whether an activity is fundamental to a person's religion or whether a person is compelled to violate a specific tenet of their religious faith. *See* 71 Pa. Stat. Ann. § 2403 (defining substantially burden as "an agency action which . . . [d]enies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion [or c]ompels conduct or expression which

73

violates a specific tenet of a person's religious faith.").[42]
Arguably, a violation of a general tenet might substantially
burden one's religious faith. But that was not what the
Pennsylvania General Assembly proscribed. The statutory
language shifts the burden of establishing a compelling interest
and least restrictive means to the state actor only after the
violation of a specific tenet, which must mean something
different from a general tenet. As noted, the dilemma is
especially striking because, in the view of the believer, the
violation of a general tenet may very well substantially burden
one's religious faith.

Nevertheless, given the normal usage of the term, it is
difficult to see that Parents have cited a *specific* tenet that would
prohibit reporting requirements and discretionary school district
review of their children's educational progress. Instead, they
reference general, but nonetheless important, religious tenets,

---

[42]As noted, in *Ridley Park* the Pennsylvania Commonwealth
Court examined the third definition of "substantially burden" –
"denies a person a reasonable opportunity to engage in activities
which are fundamental to the person's religion" – and concluded
that while daycare "aided in carrying out the Church's religious
mission, [it] is not a fundamental religious activity of a church."
*Ridley Park*, 920 A.2d at 960. "For example, ministering to the
sick can flow from a religious mission, but it is not a
fundamental religious activity of a church because a hospital
may be built to satisfy that mission." *Id.*

*see, e.g., Luke* 20:25 ("Then render to Caesar the things that are Caesar's, and to God the things that are God's."); 2 *Timothy* 2:15 ("Be diligent to present yourself approved to God."), to assert that local school districts have no authority to conduct a limited review of their children's educational progress.  In addition, under RFPA's fourth definition of "substantially burden," a party must establish a nexus between the specific tenet and the compelled violation, a nexus that Parents have not established here.

Furthermore, the inconsistencies in Parents' complaints, depositions, briefs and appellate oral argument suggest the difficulty in identifying a specific tenet (as opposed to a general tenet) and its attendant consequences.  In their complaints, briefs to the district court, and some deposition testimony, Parents asserted a "specific tenet" that the state "lacks the jurisdiction" over their children's education, i.e., that no level of state review would be permissible.[43]  *See* Parents Br. Opp'n to Def.'s Mot. Summ. J. at 9-10, Apr. 14, 2006.  But at oral argument, Parents implied that their asserted "tenet" might allow non-discretionary review of their home education programs.  *See also* Parents Reply Br. at 8 ("Parents do not contend that the government may not establish any standards to govern home education.  Rather,

_____

[43]Although it is not entirely clear, I understand Parents' argument to mean that the natural consequence of their asserted specific tenet is that the state has no jurisdiction over home-schooling.

75

the Parents' core objection . . . is that their religious beliefs forbid them from submitting their religious education of their children to the discretionary review of a governmental official."). Yet it is problematic whether this interpretation of "non-discretionary" review would amount to any review at all.

Based upon the plain language of the RFPA, Parents have failed to prove by clear and convincing evidence that they have been compelled or will likely be compelled to violate a specific tenet of their religious faith. Accordingly, Parents cannot sustain their cause of action under the Pennsylvania RFPA.

III.

Even finding the term "specific tenet" in the RFPA to be ambiguous, the decision would be the same. As noted, the purpose of statutory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa. Cons. Stat. § 1921(a). Under section 1921(c), when a statute's words are ambiguous, the intention of the General Assembly "may be ascertained" by considering an array of factors.[44]

---

[44]As noted, those factors include, but are not limited to: "(1) The occasion and necessity for the statute. (2) The circumstances under which it was enacted. (3) The mischief to be remedied. (4) The object to be attained. (5) The former law, if any, including other statutes upon the same or similar subjects. (6) The consequences of a particular interpretation. (7) The contemporaneous legislative history. (8) Legislative and

The historical background and legislative history of Pennsylvania's RFPA places it in context and assists in interpreting the statute. Much of this depends on the development of federal First Amendment jurisprudence and its influence on Pennsylvania law. Prior to 1990, legislation and government regulation burdening the free exercise of religion was subject to the *Sherbert* test. *See Sherbert v. Verner*, 374 U.S. 398 (1963). Under this rule, if the government substantially burdened a person's constitutional free exercise rights, then it was required to justify the burden with a compelling state interest and with proof that the least restrictive means was employed. *Id.* at 402-04. *See also Jimmy Swaggart Ministries v. Bd. of Equalization of California.*, 493 U.S. 378, 384-85 (1990) ("Our cases have established that 'the free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.'" (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989))).

In 1990, the Supreme Court held that the Free Exercise Clause did not prohibit enforcement of a neutral law of general applicability supported by a rational basis. *Employment Div., Dept. of Human Res. of Oregon v. Smith*, 494 U.S. 872, 890 (1990). The Court concluded that the state could deny

---

administrative interpretations of such statute." 1 Pa. Cons. Stat. § 1921(c).

unemployment benefits due to work-related misconduct based upon an employee's religiously motivated ingestion and use of a drug; specifically, in that case, the ceremonial use of peyote. *Id.* Declining to apply the *Sherbert* balancing test, the Court noted that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982)). Thus, *Smith* and its progeny "establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993) (citing *Smith*).

The *Smith* Court noted that religious exemptions, while not constitutionally required, could be created through the political process. *Smith*, 494 U.S. at 890 (citing several state statutes making "an exception to their drug laws for sacramental peyote use"). In 1993, Congress accepted the Court's invitation by enacting the Religious Freedom Restoration Act ("RFRA"), 107 Stat. 1488, 42 U.S.C. §§ 2000bb to 2000bb-4 (amended 2000). Congress sought to restore the compelling interest test articulated in *Sherbert* and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), "and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb. Applicable to "all Federal and State law," Pub. L. No.

78

103-141, § 6, 107 Stat. 1488, 1489 (1993), RFRA prohibited both the federal and state governments[45] from "substantially burden[ing] a person's exercise of religion" except through the least restrictive means of furthering a compelling interest. 42 U.S.C. § 2000bb-1. In 1997, the Supreme Court struck down RFRA as applied to the states[46] because RFRA exceeded the scope of Congress' enforcement power under section 5 of the Fourteenth Amendment. *Boerne v. P.F. Flores*, 521 U.S. 507, 536 (1997). RFRA lacked a "congruence and proportionality between the injury to be prevented or remedied and the means

---

[45]At the time of enactment in 1993, "Government" was defined as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State, or a subdivision of a State." Pub. L. No. 103-141, § 5, 107 Stat. 1488, 1489 (1993). As amended, "Government" is defined as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2(1). "Covered entity means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States." *Id.* § 2000bb-2(2).

[46]RFRA continues to be enforced against the federal government. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (applying RFRA to regulations by the federal government under the Controlled Substances Act).

79

adopted to that end."  *Id.* at 520, 529-36.

In part a reaction to *City of Boerne*, Congress enacted the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to 2000cc-5, which addresses only land use regulations and the religious rights of institutionalized persons. *Id.* §§ 2000cc, 2000cc-1.  RLUIPA prohibits both state and federal governments from imposing a "substantial burden" on the religious exercise of an institutionalized person unless it is the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000cc-1.  Also, several states in addition to Pennsylvania passed their own religious freedom restoration or protection legislation.[47]

Although there are differences among the various federal and state religious protection statutes, most contain, at their core, the same fundamental structure and purpose.  They

---

[47]*See* Ariz. Rev. Stat. Ann. §§ 41-1493; Conn. Gen. Stat. § 52-571b; Fla. Stat. § 761.01 to 761.05; Idaho Code Ann. §§ 73-401 to 73-404; 775 Ill. Comp. Stat. 35/1 to 35/99; Mo. Ann. Stat. §§ 1.302 & 1.307; N.M. Stat. §§ 28-22-1 to 28-22-5; Okla. Stat. tit. 51 §§ 251 to 258; R.I. Gen. Laws §§ 42-80.1-1 to 42-80.1-4; S.C. Code Ann. §§ 1-32-10 to 1-32-60; Tex. Civ. Prac. & Rem. Code Ann. §§ 110.001 to 110.012; Va. Code Ann. §§ 57-1 to 57-2.02; Utah Code Ann. §§ 63L-5-101 to 63L-5-403; *see also* Ala. Const. Art I, § 3.01.  The Pennsylvania RFPA became effective December 9, 2002.  Missouri, Utah and Virginia passed legislation after 2002.

80

recognize that neutral laws of general applicability may burden religious exercise as significantly as laws intended to interfere with religious exercise. The federal statutes, Pennsylvania's RFPA, and a majority of the state statutes also acknowledge the government need not justify every action having some effect on religious exercise. Under those statutes, only *substantial* burdens trigger heightened scrutiny.[48] RFPA's four definitions of "substantially burden" emphasize the importance of this threshold. *See* 71 Pa. Stat. Ann. § 2403 ("*significantly* constrains or inhibits"; "*significantly* curtails"; "denies . . . a reasonable opportunity to engage in activities . . . *fundamental* to the person's religion"; "violates a *specific tenet* of a person's religious faith.") (emphasis added).

In our modern regulatory state, virtually all legislation (including neutral laws of general applicability) imposes an incidental burden at some level by placing indirect costs on an individual's activity. Recognizing this, legislatures have sought a balance between protecting free exercise of religion and

---

[48]Alabama and Connecticut do not modify "burden." Ala. Const. Art I, § 3.01 ("Government shall not burden a person's freedom of religion . . . ."); Conn. Gen. Stat. § 52-571b ("The state . . . shall not burden a person's exercise of religion . . . ."). Missouri, New Mexico, and Rhode Island prohibit the government from "restrict[ing] a person's free exercise of religion." Mo. Ann. Stat. § 1.302; N.M. Stat. §§ 28-22-3; R.I. Gen. Laws §§ 42-80.1-3.

preserving an effective police power.  The federal government, Pennsylvania, and several other states have identified a substantiality threshold as the tipping point for requiring heightened justifications for governmental action.[49]

---

[49]To illustrate, for the purposes of RLUIPA, we recognize that a "substantial burden" exists where:

> 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007).  Under the Florida Religious Freedom Restoration Act, "a substantial burden on the free exercise of religion is one that either compels the religious adherent to engage in conduct that his religion forbids or forbids him to engage in conduct that his religion requires."  *Warner v. Boca Raton*, 887 So.2d 1023, 1033 (Fla. 2004).  "A plaintiff who claims that a governmental regulation constitutes a substantial burden must 'prove that a governmental regulatory mechanism burdens the adherent's practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates.'"  *Id.* at 1035 (citations omitted).

Furthermore, by requiring proof of a "substantial burden" by clear and convincing evidence, Pennsylvania appears to have set a higher threshold than other religious restoration statutes. *Compare* 71 Pa. Stat. Ann. §§ 2404, 2405 (requiring "clear and convincing evidence" of substantial burden), *with* 42 U.S.C. § 2000cc-2(b) ("plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice . . . substantially burdens the plaintiff's exercise of religion"), *Warner*, 887 So.2d at 1034 ("[T]he plaintiff bears the initial burden of showing that a regulation constitutes a substantial burden . . . ."), *Diggs v. Snyder*, 775 N.E.2d 40, 45 (Ill. App. Ct. 2002) (requiring, under the Illinois Religious Freedom Restoration Act, plaintiff "to make a threshold showing" of substantial burden).

As noted, Parents have not cited a specific tenet that would prevent adherence to the reporting requirements or prohibit discretionary School District review of their children's educational progress. Instead, they reference general, but important, religious tenets to support their claim that local school districts have no authority to conduct limited review of their home education programs. Such a broad interpretation of the term "specific tenet" would appear to read "specific" out of the statute.

The occasion, necessity, and purpose of the RFPA do not support a finding, by clear and convincing evidence, that Parents are compelled or will likely be compelled to violate a specific

83

tenet of their religious faith.  Accordingly, Parents cannot prevail on their cause of action under the Pennsylvania RFPA.